# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE                    NEWS RELEASE #044

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **18th day of September, 2017**, are as follows:

**BY WEIMER, J.:**

2015-K-0886     STATE OF LOUISIANA v. LESLIE C. THOMPSON (Parish of Jackson)
                For the foregoing reasons, we reverse the judgment of court of
                appeal, vacate defendant's convictions and sentences, and remand
                this matter to the district court for a new trial as to Count 1
                of the malfeasance charge.
                REVERSED, VACATED, AND REMANDED

                JOHNSON, C.J., concurs in part, dissents in part and assigns
                reasons.
                GUIDRY, J., concurs in the result.
                CLARK, J., concurs in part; dissents in part and dissents in part
                and assigns reasons.
                CRICHTON, J., concurs in part, dissents in part and
                assigns reasons.
                GENOVESE, J., concurs in the result.

# SUPREME COURT OF LOUISIANA

## No. 2015-K-0886

## STATE OF LOUISIANA

## VERSUS

## LESLIE C. THOMPSON

*On Writ of Certiorari to the Court of Appeal, Second Circuit,
Parish of Jackson*

**WEIMER**, Justice

We granted certiorari in this case primarily to consider defendant's contentions that: (1) the evidence was insufficient to support his convictions on three counts of malfeasance in office, (2) the district court erred by permitting the state to introduce unduly prejudicial "other bad acts" evidence under La. C.E. art. 404(B) and the court of appeal compounded that error by applying a faulty "harmless error" analysis in assessing the effect of the erroneous admissions, and (3) the district court erred in denying his motion for a mandatory mistrial under La. C.Cr.P. art. 770 due to the prosecutor's references to race.

After reviewing the evidence in this case from the perspective of a rational trier of fact who interprets that evidence as favorably to the prosecution as any rational trier of fact could, we conclude that the evidence was sufficient to find defendant guilty beyond a reasonable doubt as to Count I of the malfeasance in office charge; however, as to Counts II and III, we find that no rational trier of fact could have

found defendant guilty beyond a reasonable doubt. Pretermitting all other assignments of error, we additionally find that the district court erred in denying defendant's motion for a mandatory mistrial after the prosecutor directly referenced race in a comment before the jury that was neither material nor relevant and that could create prejudice against defendant in the minds of the jury members. Accordingly, we vacate defendant's convictions and sentences, and remand this case to the district court for further proceedings consistent with this opinion.

**FACTS AND PROCEDURAL HISTORY**

Defendant Leslie C. Thompson assumed the office of mayor of the town of Jonesboro on January 1, 2007. On March 5, 2013, during his second term of office, the state filed a bill of information charging defendant, as a principal, with three counts of malfeasance in office in violation of La. R.S. 14:134 ("Malfeasance in office"), La. R.S. 14:24 ("Principals"), and La. R.S. 33:404 ("Duties of mayor"). Specifically, the bill of information alleged that Mayor Thompson:

> being a public officer or public employee, did intentionally fail to perform a duty required of him, as such officer or employee, and intentionally performed such duty in an unlawful manner, and knowingly permitted other public officers and public employees, under his authority, to intentionally refuse or fail to perform such duty lawfully required of him, or perform such duty in an unlawful manner by failing to direct the administration and operation of the Town of Jonesboro, including all municipal departments, offices, and agencies, in conformity with provisions of state law, in that

> **Count I**: on or about June 30, 2007 through June 30, 2012, in violation of La. R.S. 24:513, La. R.S. 24:518, La. R.S. 44:36, and La. R.S. 44:412, he:

> 1.   neglected, failed or refused to furnish the legislative auditor with such papers, accounts, books, documents, films, tapes, and other forms of recordation, including but not limited to computer and recording devices, whether confidential or otherwise, that the legislative auditor has the right to inspect and examine, and

2. denied the legislative auditor access to the office, or to papers, accounts, books, documents, films, tapes, and other forms of recordation, including but not limited to computer and recording devices, whether confidential or otherwise, that he has the right to inspect or examine, and

3. refused, failed, or neglected to transmit to the legislative auditor reports, statements of accounts or other documents upon request as provided by law, and

4. obstructed or impeded, in any manner, the legislative auditor in making the examination authorized by law, and

5. failed to exercise diligence and care in preserving the public records of the Town of Jonesboro for the period or periods of time specified by law for such public records or not preserving and maintaining those records for a period of at least three years from the date on which the public record was made, and

6. failed to establish and maintain an active continuing program for the economical and efficient management of the records of the Town of Jonesboro, and

***Count II***: between January 2011 and June 2012, in violation of La. R.S. 14:67, La. R.S. 11:1751, and La. R.S. 11:1732(13) he misappropriated or took, with the intent to deprive permanently, a thing of value of a value of one thousand five hundred dollars or more, to-wit: public funds belonging to the Town of Jonesboro in the amount of $13,720.75, which belong to another, without the consent of the other to the misappropriation or taking, and by means of fraudulent conduct, practices, or representations, specifically by providing payments of public funds to the Municipal Employees Retirement system for employees who were not actively employed on a permanent regularly scheduled basis of at least thirty-five hours per week, and

***Count III***: between January 2011 and June 2012, in violation of, La. R.S. 14:68 he took or used, without the intent to deprive permanently, a movable, to-wit: public funds belonging to the Town of Jonesboro in the amount of $38,072.06, which belong to another, without the consent of the other to the taking or use, and by means of fraudulent conduct, practices, or representations, specifically by providing payments of public funds for Blue Cross Blue Shield of Louisiana insurance premiums for non-employees of the Town of Jonesboro.

3

Following the institution of prosecution, numerous pre-trial motions were filed,[1] including among them, a notice filed by the state seeking to introduce other crimes, wrongs, or acts pursuant to La. C.E. art. 404(B). A contradictory hearing on the Article 404(B) notice was held, at which the state presented the testimony of several witnesses in an attempt to establish the admissibility of 11 "other bad acts" allegedly committed by defendant. At the conclusion of that hearing, the district court determined that the probative value of the "bad acts" evidence outweighed its prejudicial effect and, therefore, allowed each act alleged in the Article 404(B) notice to be introduced into evidence.

The case then proceeded to trial, with jury selection beginning on August 26, 2013, followed by testimony commencing on August 29, 2013. During the examination of one of the state's initial witnesses, the prosecutor made a reference to race in the presence of the jury, stating that "there's been an allegation made ... [that] the Mayor has been harried by various conservatives and or white people." Defendant objected and moved for a mistrial on grounds the prosecutor was injecting race into the proceedings. The district court overruled the objection and denied the motion for mistrial, reasoning that the defense had alluded to race during *voir dire* and the opening statement and, thus, the state was entitled to rebut the racial implications.

Defendant subsequently filed a written motion for mistrial alleging that racial issues had clearly become a factor in the trial. Defendant pointed out that both parties had questioned potential jurors regarding racial fairness during *voir dire* and several members of the venire had expressed concern that any verdict (guilty or not guilty)

---

[1] By way of illustration, defendant filed motions to quash, a motion to recuse the trial judge, a motion for security measures, a motion for a sequestered jury, and several motions regarding jury instructions.

would divide the community further. Defendant also argued that the prosecutor's reference to "white people" in the presence of the jury was a mandatory, and not a permissive, ground for a mistrial under La. C.Cr.P. art. 770. The district court denied defendant's motion after hearing argument from the parties. Defendant then sought writs on the ruling, which the court of appeal denied, finding no palpable error in the ruling and that defendant had an adequate remedy on appeal. **State v. Thompson**, 48,848 (La.App. 2 Cir. 9/11/13) (unpub'd).

Testimony continued and finally concluded on September 10, 2013. At the close of deliberations, the jury unanimously found defendant guilty as charged of all three counts of malfeasance in office. Following the denial of his motion for new trial, the district court sentenced defendant as follows. As to Counts I and II, defendant was sentenced to serve consecutive terms of three years at hard labor, with $1,000 fines imposed as to each count. As to Count III, the court sentenced defendant to five years at hard labor, with all five years suspended, said sentence to run concurrently with his sentences for Counts I and II, plus a $1,000 fine and court costs. The court additionally ordered that defendant be placed under supervised probation for a period of five years following his release from incarceration. Finally, the court ordered that defendant pay restitution of the town of Jonesboro in the amount of $51,792.81, which represents the aggregate of the amounts identified in Counts II and III.

Defendant appealed his convictions and sentences. In a thorough (and lengthy) opinion, the court of appeal affirmed defendant's convictions, but vacated his sentences and remanded for re-sentencing. **State v. Thompson**, 49,483, p. 92 (La.App. 2 Cir. 3/18/15), 163 So.3d 139, 192.

5

Addressing the sufficiency of the evidence first, the court of appeal concluded that the state's evidence was sufficient to prove all three counts of malfeasance in office beyond a reasonable doubt. With respect to Count I, which charged that defendant committed malfeasance by failing and/or refusing to maintain proper records and to supply them to the Louisiana Legislative Auditor, the court of appeal found the evidence sufficient because it demonstrated the town's financial records were so incomplete and disorganized that auditors issued disclaimers for five consecutive years. The court found sufficient evidence of defendant's intent to breach his statutory duties as mayor in the fact that defendant had knowledge of the poor state of the town's financial records and did not take sufficient action to remedy the continuing problems, coupled with the Article 404(B) evidence demonstrating that defendant failed to provide proper documentation of his own activities as mayor.

With respect to Count II, which charged that defendant committed malfeasance by taking public funds of the town in the amount of $13,720.75 to pay for retirement benefits for employees who were not eligible to participate in the Municipal Employee's Retirement System, the court of appeal found the evidence sufficient because it demonstrated that six employees included in the retirement system were not consistently working 35 hours per week as required for eligibility under town policy and state law and because defendant continued using the town's funds to pay retirement contributions for ineligible employees even after being notified of their ineligibility. Finally, with respect to Count III, which charged that defendant committed malfeasance by using public funds of the town totaling $38,072.06 to pay for health insurance premiums for former employees, the court of appeal found the evidence sufficient because it showed that defendant continued to sign checks for health insurance premiums after being notified that former town employees were still

6

included in the premiums, yet he took no action to assist employees in ending the payments, thereby violating "his statutory duty to properly manage the employees' and the Town's resources." **Thompson**, 49,483 at 59, 163 So.3d at 176.

The court of appeal then considered the "other bad acts" evidence, finding the district court erred in admitting the La. C.E. art. 404(B) evidence because the court did not address the admissibility of each item individually or find defendant's commission of the acts was proved by clear and convincing evidence. Addressing each act individually, the court of appeal further found that out of the 11 "other bad acts" admitted, five should have been ruled inadmissible either because they were too dissimilar to the charged conduct to be probative, or the other acts were not proved by clear and convincing evidence. Nonetheless, the court found the error harmless because the state presented ample evidence to support the convictions and defendant failed to show prejudice. **Thompson**, 49,483 at 75-76, 163 So.3d at 184.

The court of appeal also found that the district court "could have" granted defendant's motion for mistrial under La. C.Cr.P. art. 770 because the prosecutor improperly injected race into the proceedings. However, the court of appeal concluded the error was harmless because the comment did not appear to have contributed to the verdict. **Thompson**, 49,483 at 80-81, 163 So.3d at 187.

Finally, the court of appeal found defendant's sentences, while individually within statutory guidelines, were excessive when aggregated, and that the district court failed to articulate sufficient reasons to run the sentences for Counts I and II consecutively, as they were based on the same acts and transactions. **Thompson**, 49,483 at 65-66, 163 So.3d at 179-80. The appellate court also found insufficient evidence to support the restitution ordered for Count II, because the state failed to

7

show that the loss could not be recovered.[2]  **Thompson**, 49,483 at 67, 163 So.3d at 180.

Defendant applied to this court for writs, assigning error to the court of appeal's rulings on the sufficiency of the evidence, the denial of requested jury instructions, the admissibility of Article 404(B) "other crimes" evidence, the denial of motions to quash on grounds of prescription and double jeopardy, the denial of defendant's motion for mistrial, and the denial of motions to bar the prosecutor from carrying a weapon and to prevent the state's case agent from serving as bailiff.  We granted writs primarily to address three issues: the sufficiency of the evidence, the admission of the "other bad acts" evidence pursuant to La. C.E. art. 404(B), and the denial of defendant's motion for mistrial.  **State v. Thompson**, 15-0886 (La. 2/24/17), 216 So.3d 55.

## LAW AND ANALYSIS

*Sufficiency of the evidence*

Because the lack of sufficient evidence to sustain defendant's convictions would entitle defendant to an acquittal under **Hudson v. Louisiana**, 450 U.S. 40, 44-45 (1981), we begin our analysis with defendant's contention that the evidence was insufficient to support his convictions for all three counts of malfeasance in office. See **State v. Crawford**, 14-2153, p. 19 (La. 11/16/16), 218 So.3d 13, 25 (citing **State v. Mickelson**, 12-2539, p. 5 (La. 9/3/14), 149 So.3d 178, 182).

---

[2]  In addition to addressing the foregoing issues, the court of appeal found no error in rulings by the district court regarding jury instructions, a motion to quash on grounds of prescription, a motion to quash on grounds of double jeopardy and the rule of lenity, a motion to recuse the trial judge, the revocation of defendant's bail, a motion to prevent the prosecutor from bringing weapons into the courtroom, allowing a witness to serve as the state's case agent, a motion to change venue, a **Batson** challenge, a motion to sequester the jury, and a patent error review.  Because the court of appeal's resolution of these issues is not relevant to our ultimate disposition of this case, we find it unnecessary to discuss these issues.

In both his counseled brief and a *pro se* supplement, defendant argues the evidence was insufficient to support his convictions for Counts I, II, and III of the bill of information charging malfeasance in office because the state failed to provide evidence of his intentional violation of a statute or law which expressly delineates an affirmative duty on him in his official capacity.

In addressing a claim regarding the sufficiency of the evidence, the task of the reviewing court is to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." **Jackson v. Virginia**, 443 U.S. 307, 319 (1979). As we have recently reiterated, "[t]he **Jackson** standard does not permit this court to substitute its own appreciation of the facts for that of the factfinder." **Crawford**, 14-2153 at 20, 218 So.3d at 26. Neither does it allow the court to assess the credibility of witnesses or reweigh the evidence. *Id.* Rather, in a sufficiency review, "the actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law." *Id.* (quoting **State v. Mussall**, 523 So.2d 1305, 1310 (La. 1988)).

Of particular relevance to the present case is the fact that the deference demanded by **Jackson** is not affected when circumstantial evidence forms the basis of the conviction.[3] As we explained in **Crawford**:

> In circumstantial evidence cases, this court does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events. Rather, this court, evaluating the evidence in the light most favorable to the prosecution, determines whether the possible alternative hypothesis is sufficiently **reasonable** that a rational juror could not have found proof of guilt beyond a reasonable doubt under **Jackson v. Virginia**[.]

---

[3] La. R.S. 15:438 describes the rule as to circumstantial evidence as follows: "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."

**Crawford**, 14-2153 at 20, 218 So.3d at 26 (quoting **State v. Davis**, 92-1623, p.11 (La. 5/23/94), 637 So.2d 1012, 1020).   Under **Jackson**, the test for evidentiary sufficiency, both direct and circumstantial, is an objective one based on the point of view of a hypothetical rational trier of fact.   See **State v. Mack**, 13-1311, p. 9 (La. 5/7/14), 144 So.3d 983, 989.

In order to survive defendant's sufficiency challenge in the present case, the record must establish that the state proved beyond a reasonable doubt, as to each of the charged counts, all of the essential elements of the offense of malfeasance in office.   Malfeasance in office is defined in La. R.S. 14:134:

> A. Malfeasance in office is committed when any public officer or public employee shall:
>
> (1) Intentionally refuse or fail to perform any duty lawfully required of him, as such officer or employee; or
>
> (2) Intentionally perform any such duty in an unlawful manner; or
>
> (3) Knowingly permit any other public officer or public employee, under his authority, to intentionally refuse or fail to perform any duty lawfully required of him, or to perform any such duty in an unlawful manner.
>
> B. Any duty lawfully required of a public officer or public employee when delegated by him to a public officer or public employee shall be deemed to be a lawful duty of such public officer or employee. The delegation of such lawful duty shall not relieve the public officer or employee of his lawful duty.

Under this statute, the state must prove the existence of a law or statute imposing an affirmative duty on the defendant as a public officer and that the defendant intentionally refused or failed to perform that duty or intentionally performed that duty in an unlawful manner. **State v. Davis**, 93-0599 (La. 4/11/94), 634 So.2d 1168, 1170.  The duty must be one expressly imposed by law on the public officer because the officer is entitled to know exactly what conduct is expected of him

in his official capacity and what conduct will expose him to criminal charges. **State v. Perez**, 464 So.2d 737, 741 (La. 1985). Intent is likewise an essential element of the offense. As we recently explained:

> Louisiana R.S. 14:134 does not criminalize all ethical violations and/or general derelictions of duty. The object of the malfeasance statute is to punish a breach of duty committed with the required culpable state of mind. To this end, the statute expressly limits its application to instances in which a public officer or employee *intentionally* refuses or fails to perform or *intentionally* performs in an unlawful manner, any affirmative duty imposed by law upon him in his role as a public servant. The inclusion in the statute of a criminally culpable state of mind makes it clear that it applies only where the statutorily required *mens rea* is proven beyond a reasonable doubt. Thus, mere inadvertence or negligence, or even criminal negligence, will not support a violation of the malfeasance statute because the statute specifies the act or failure to act must be intentional.

**State v. Petitto**, 10-0581, p. 13 (La. 3/15/11), 59 So.3d 1245, 1254 (emphasis in original).

Further, because the state charged defendant as a principal, it must show beyond a reasonable doubt that defendant had an affirmative duty in his capacity as a public officer, and that he either intentionally refused to perform that duty or performed the duty in an unlawful manner *himself*, or was concerned in the commission of the intentional refusal to perform that duty or concerned in the commission of the intentional performance of that duty in an unlawful manner *by another*. La. R.S. 14:24.[4]

The bill of information in this case charges that the duties defendant intentionally failed to perform (or intentionally performed in an unlawful manner) are

---

[4] La. R.S. 14:24 sets forth the law with respect to principals:

> All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.

his duties as mayor of Jonesboro. Louisiana R.S. 33:404 establishes the duties of mayors. It provides, in pertinent part:

A. The mayor shall have the following powers, duties, and responsibilities:

(1) To supervise and direct the administration and operation of all municipal departments, offices, and agencies, other than a police department with an elected chief of police, in conformity with ordinances adopted by the board of aldermen and with applicable provisions of state law; however, no such ordinance may limit the authority granted to the mayor by this Paragraph. All administrative staff shall be subordinate to the mayor.

(2) To delegate the performance of administrative duties to such municipal officers or employees as he deems necessary and advisable.

(3) Subject to applicable state law, ordinances, and civil service rules and regulations, to appoint and remove municipal employees, other than the employees of a police department with an elected chief of police. However, appointment or removal of a nonelected chief of police, the municipal clerk, the municipal attorney, or any department head shall be subject to approval by the board of aldermen, except that in the case of a tie vote, the recommendation of the mayor shall prevail. Furthermore, selection or removal of any person engaged by a municipality to conduct an examination, review, compilation, or audit of its books and accounts pursuant to R.S. 24:513 shall be subject to approval by the board of aldermen of that municipality.

(4) To sign all contracts on behalf of the municipality.

(5) To prepare and submit an annual operations budget and a capital improvements budget for the municipality to the board of aldermen in accordance with the provisions of R.S. 39:1301 et seq. and any other supplementary laws or ordinances.

(6) To represent the municipality on all occasions required by state law or municipal ordinance.

(7) To be the keeper of the municipal seal and affix it as required by law.

(8) To sign warrants drawn on the treasury for money, to require that the municipal clerk attest to such warrants, to affix the municipal seal thereto, and to keep an accurate and complete record of all such warrants.

12

(9) To have any other power or perform any other duty as may be necessary or proper for the administration of municipal affairs not denied by law.

La. R.S. 33:404(A).

### *Count I*

In Count I, the state charged that defendant, in contravention of his duties as mayor, committed malfeasance in office by neglecting, failing or refusing to furnish the Legislative Auditor with such records that the Legislative Auditor has the right to inspect and examine; denying the Legislative Auditor access to the office, or to such records, that the Legislative Auditor has the right to inspect or examine; refusing, failing or neglecting to transmit to the Legislative Auditor reports, statements of accounts or other documents upon request; and obstructing or impeding the Legislative Auditor in making the examination authorized by law. In addition, the state alleged that defendant committed malfeasance in office by failing to exercise reasonable diligence and care in preserving the public records of the town of Jonesboro for the period of time required by law and by failing to establish and maintain an active continuing program for the economical and efficient management of the records of the town of Jonesboro.

The provisions of law from which these allegations arise derive from the sections of the Revised Statutes addressing Public Records and the duties of the Legislative Auditor. Specifically, La. R.S. 24:513 directs that "the legislative auditor shall have authority to compile financial statements and to examine, audit, or review the books and accounts of ... municipalities" (among other enumerated entities) annually, which task may be performed by a licensed certified public accountant engaged for that purpose, approved by the Legislative Auditor, and acting "in accordance with generally accepted governmental auditing standards and the

13

Louisiana Governmental Audit Guide." La. R.S. 24:513(A)(1)(a), (3), (5)(a)(I), and (6), and (J)(1). In connection with the audit, "the legislative auditor[, or his designee,] shall have access to and be permitted to [inspect and copy] all papers, books, accounts, records, files, instruments, documents, films, tapes, and other forms of recordation of all auditees, including but not limited to computers and recording devices" of the auditee, and the auditee, its officials and its staff are "directed to assist the legislative auditor in his work and to furnish such information, reports, aid, services and assistance as may be requested." La. R.S. 24:513(A)(1)(a) and (5), (E), (H)(1), and (I). The neglect, failure or refusal of any auditee or of any public officer or employee of the auditee to furnish the Legislative Auditor with such records as the auditor has the right to inspect and examine, the denial of access to such records, or the commission of any acts which obstruct or impede the Legislative Auditor in making the examination authorized by law subjects the offending party to fines and penalties. La. R.S. 24:518(A)(1). Significantly for this case, any public officer of an auditee who violates the provisions of La. R.S. 24:513 "shall, in addition to the ... fines and penalties, be deemed guilty of malfeasance and gross misconduct in office, and subject to removal." La. R.S. 24:518(A)(2); see also La. R.S. 24:513(K).

In addition to the foregoing provisions of law, La. R.S. 44:412(A) of the law on public records directs that the head of each state agency[5] and its subdivisions must establish and maintain an active records management system. Specifically, La. R.S. 44:412(A) provides:

> The head of each agency of the state and its subdivisions shall establish and maintain an active, continuing program for the economical and efficient management of the records of the agency. Such program

---

[5] La. R.S. 44:402(5) defines "agency" as "any state, parish and municipal office, department, division, board, bureau, commission, authority, or other separate unit of state, parish, or municipal government created or establish by the constitution, law, resolution, proclamation, or ordinance."

shall provide for: effective controls over the creation, maintenance, and use of records in the conduct of current business; cooperation with the division in applying standards, procedures, and techniques designed to improve the management of records, promote the maintenance and security of records deemed appropriate for preservation, and facilitate the segregation and disposal of records of temporary value; and compliance with the provisions of this Chapter and the rules, and regulations of this division.

In furtherance of this requirement, La. R.S. 44:36 stipulates the manner in which public records of public bodies[6] must be preserved by the custodians[7] thereof.

It provides, in pertinent part:

> All persons and public bodies having custody or control of any public record, other than conveyance, probate, mortgage, or other permanent records required by existing law to be kept for all time, shall exercise diligence and care in preserving the public record for the period or periods of time specified for such public records in formal records retention schedules developed and approved by the state archivist and director of the division of archives, records management, and history of the Department of State. However, in all instances in which a formal retention schedule has not been executed, such public records shall be preserved and maintained for a period of at least three years from the date on which the public record was made. ... [La. R.S. 44:36(A)]

Basically, the state's theory under Count I was that the town of Jonesboro did not maintain the public records necessary for an audit in accordance with the provisions of La. R.S. 24:513, and that the town's failure to prepare and maintain such records resulted in the issuance of disclaimers for five consecutive years. Defendant, as mayor of Jonesboro, had a duty to direct and supervise the administration of the town in conformity with applicable provisions of state law, but

---

[6] "Public bodies" are defined in La. R.S. 44:1(A)(1) as "any branch, department, office, agency, board, commission, district, governing authority, political subdivision, or any committee, subcommittee, advisory board, or task force thereof, any other instrumentality of state, parish, or municipal government, including a public or quasi-public nonprofit corporation designated as an entity to perform a governmental or proprietary function, or an affiliate of a housing authority."

[7] "Custodian" is defined in La. R.S. 44:1(A)(3) as "the public official or head of any public body having custody or control of a public record, or a representative specifically authorized by him to respond to requests to inspect any such public records."

15

by willfully failing to provide audits and to ensure the town prepared and maintained adequate records to permit an audit, defendant committed malfeasance in office.

The state's evidence in furtherance of this theory consisted of testimony from the Louisiana Legislative Auditor, members of his staff who conducted compliance and investigative audits of the town, and the certified public accountants engaged by the town to perform its annual audits during the relevant time periods. Daryl Purpera, the Legislative Auditor, explained that all governmental bodies are required to report their financial conditions annually, and that municipalities with annual revenues in excess of $500,000, such as the town of Jonesboro, are required to retain an independent certified public accountant to conduct auditing procedures and prepare an audit report. The resultant report can take one of four forms: an unqualified opinion, a qualified opinion, an adverse opinion, or a disclaimer. Of those options, the disclaimer is the least desirable, as it is an indication that the books and records of the governmental body are such that no opinion can be formed as to the financial condition of the body. In effect, the disclaimer is a type of "non-audit," as it represents a finding by the auditor that there is not sufficient documentation to support a conclusion that the financial statements of the town are accurate. In the case of the town of Jonesboro, disclaimers were issued by the certified public accountants hired to conduct annual audits for an unprecedented five consecutive years: the fiscal years ending June 30, 2008, 2009, 2010, 2011, and 2012.

Mr. Purpera testified that he first became aware of potential problems with the financial reports of Jonesboro in June 2009. As of that date, his office had not received an audit report for the fiscal year ending June 30, 2008, although the law requires the submission of audit reports six months after the end of the fiscal year (or by December 31 of the calendar year). It was not until July of 2009 that an audit

16

report was submitted for the fiscal year ending June 30, 2008, and that report was a disclaimer.

Once alerted to a potential problem, Mr. Purpera sent an advisory group from his staff to Jonesboro to provide advice on how to correct the deficiencies. He sent advisory groups again in 2010, 2011, and 2012. In addition, the Legislative Auditor Advisory Council and the Fiscal Review Committee worked with the town to help it become financially accountable. Mr. Purpera also discussed the town's problems directly with defendant. According to Mr. Purpera: "On numerous occasions the mayor would inform me that he understood what the problems were and that he was taking necessary action to correct the problems." Despite these assurances, Mr. Purpera testified that his office did not see that any action was actually being taken, as the problems persisted. He confirmed that none of the required audits for 2008 through 2012 was submitted by the legal deadline of December 31 and that defendant himself wrote to ask for extensions.

As a result of consecutive disclaimers, the Legislative Auditor's Office conducted two compliance/investigative audits of the town, the results of which were published in reports dated June 1, 2011, and March 13, 2013. Mr. Purpera testified that such audits are typically triggered by reports of misappropriation or illegal activity, and the auditor's office responds by sending auditors to act as factfinders to prove or disprove the alleged violations.

Mr. Purpera explained that his auditors rely on the auditee to provide them with all necessary records. In the case of the town of Jonesboro, many of the records requested were nonexistent. Mr. Purpera testified that defendant, as chief administrative officer of the town of Jonesboro, personally obstructed and impeded the work of the Legislative Auditor's office by refusing to provide bank

reconciliations, accounts receivable reconciliations, accounts payable reconciliations, and many other business records that should be maintained. According to Mr. Purpera, defendant obstructed his auditors in their work by not ensuring the necessary records were prepared for them in the first place. As an example of defendant's personal responsibility for the inadequate record keeping, he pointed to a Gospel Concert the town sponsored. Defendant and his wife personally assumed responsibility for selling and collecting the money for tickets, but when asked for records of how many tickets were sold and at what price points, defendant was unable to provide those records, leaving auditors unable to determine whether all cash collected was deposited to the town's account.

Kevin Kelley and Kunta Osberry, auditors from Mr. Purpera's office who worked on the June 1, 2011 compliance audit, expanded on Mr. Purpera's testimony. Mr. Kelley testified to the town's failure to properly document its expenditures. He explained that the auditors reviewed approximately 435 town expenditures, totaling approximately $1,100,000, but were unable to find documentation for 172 of these expenditures, totaling approximately $385,000. Mr. Osberry testified that the town was given a list of the 172 expenditures and asked to provide supporting documentation for each, but despite multiple opportunities to do so, the town failed to provide the requested documentation. Mr. Kelley and Mr. Osberry testified that days before trial, defendant provided documents that were allegedly those requested by the defense were suspicious because they appeared to be in identical format and did not include information normally found on invoices, such as business name, address, phone number, email or contact information. Mr. Osberry testified that the

invoices were on the same form even though they were from different individuals, and that supporting documentation for 75 of the expenditures was still missing.

Mr. Osberry recounted that he spent a large amount of his time in Jonesboro searching through unorganized files for information and that, while some of the boxes of documents were fairly organized, others were not. He recalled that the accounts payable clerk had papers scattered over her desk, on the floor, and in filing cabinets. Based on his observations, it did not appear to Mr. Osberry that the town had a formal records retention policy in place.

Mr. Osberry reiterated Mr. Purpera's account of deficient record-keeping with respect to the Gospel Concert, explaining that defendant, his wife and town employees collected cash from the ticket sales, but did not keep records about who collected funds, how much money was collected, or how many and at what price the tickets were sold, making it impossible to verify that the money deposited was the actual amount collected. He testified that he personally spoke with defendant about the need for such records, and defendant told him that "staff did have documentation showing how much money they collected from the sale of the tickets." According to Mr. Osberry, defendant "told us that he would give us that documentation. He would get it to us and he never did."

Sandra Whitehead, an auditor in the advisory services section of the Legislative Auditor's office, testified that advisory services provides training and performs assessments. She recounted that she visited Jonesboro from January through March 2011, and again in September 2011 and July 2012. She explained that one of her duties was to help the town reconcile its bank account, which had not been reconciled since 2007. Explaining that this was one of the most challenging reconciliations she had ever performed, she testified that she only reconciled bank statements up to June

2009, and her reconciliation required an adjustment of $3.6 million dollars. According to Ms. Whitehead, the town's accounting records were incomplete, in disarray, disorganized, and "a train wreck." To complicate matters, the town was transitioning to a new accounting system, no one knew how to close out the old system, and no one had been trained on the new software. Vendor folders, as well as any folders related to payroll and Internal Revenue Service, Louisiana Department of Revenue, and retirement system payments, were "pretty much non-existent." The cash receipts and cash disbursement journals for August and July 2008 were never recovered. The town did not have a records retention schedule on file with the state archivist as required by La. R.S. 44:411(A),[8] and despite a recommendation in the compliance audit report that a schedule be developed and submitted for approval to the state archivist, as of the date of trial, no records retention schedule had been filed. Moreover, because the town had failed to file its audit report in a timely manner for four consecutive years, it had become ineligible to receive state funds.

As demonstrated by the foregoing, the state presented evidence establishing that: (1) the independent auditors were unable to complete the audits mandated by La.

---

[8] In pertinent part, La. R.S. 44:411(A) provides:

> The secretary, acting through the state archivist, shall establish standards for the selective retention of records of continuing value, and monitor state and local agencies in the application of such standards to all records in their custody. To facilitate this application:

> (1) The head of each agency shall submit to the state archivist, in accordance with the policies, rules, and regulations prescribed by the secretary and the implementational standards and procedures established by the state archivist, schedules proposing the length of time each state record series warrants retention for administrative, legal, or fiscal purposes after it has been created or received by the agency.

> (2) The head of each agency shall also submit to the state archivist lists of state records in the custody of that agency which are not required for the transaction of current business and which lack sufficient administrative, legal, or fiscal value to warrant further retention and request that the state archivist authorize appropriate disposal.

R.S. 24:513 in a satisfactory and timely manner because of the disorganized and incomplete state of the town's financial records, (2) the legislative auditors were stymied in their efforts to obtain necessary documentation, (3)the town had no formal records retention schedule on file, and (4) the public records that should have been prepared and preserved for review by the auditors were not. The evidence further established that defendant was aware that the town was not in compliance with state law in these respects and that, although he had a duty as mayor "[t]o supervise and direct the administration and operation of all municipal departments" to ensure that the departments and employees under his supervision were properly performing their jobs such that the town was in compliance with state law,[9] the town continued to remain in default of its statutory obligations.

While defendant acknowledges the accounting deficiencies that plagued his administration, he argues that the evidence is devoid of any proof of intentional wrongdoing and that, to the contrary, the record demonstrates that he "did everything humanly possible" to correct the problems once the deficiencies were made known. He contends that the town's clerk is statutorily designated as the individual responsible for management and maintenance of municipal records and that the state failed to show that he acted as a principal to the clerk's failure to perform statutorily-imposed duties or that he intentionally permitted the clerk's poor records maintenance. Rather, he maintains that the evidence demonstrates he and his staff assisted and cooperated with the independent and legislative auditors and implemented their recommendations. Further, he urges that as mayor of a municipality governed by the Lawrason Act,[10] his actions were constrained by an

_____

[9] La. R.S. 33:404(A)(1),

[10] La. R.S. 33:321 et seq.

21

obligation to act in conjunction with the town's Board of Aldermen and that he did terminate one clerk, although as mayor he had no statutory duty to do so.

Indeed, as defendant argues, there is record evidence of steps defendant took to try to improve the town's admittedly deficient record keeping and accounting practices once defendant was made aware of the town's failure to comply with state law. Kenneth Folden, the independent certified public accountant hired to perform the town's audit for the fiscal year ending June 30, 2008 (the first full fiscal year after defendant assumed office), testified that he spoke with defendant on at least a weekly basis about the problems he was encountering with the audit, which problems defendant attributed to outdated software and inexperienced staff. In a written response to the disclaimer audit that was ultimately issued by Mr. Folden, defendant indicated that the town was in the process of purchasing new software and hiring additional staff.

The software was purchased as promised, but as the June 1, 2011 compliance audit reflects, approximately two years later, staff had still not been adequately trained to use the new system. Defendant did hire Melba Holland, who would later go on to become town clerk, as an office manager in 2009 to organize the town's records and filing system. He hired Earline Knox to organize the town's grant information and compliance, and later re-hired her on a contract basis to assist auditors in 2010 and 2011. He retained certified public accountant Tonya Wade in 2010 to assist in reconciling the town's bank statements and getting together schedules for the auditors. The following year, Ms. Wade entered into a joint contract with the town and the Legislative Auditor's office to perform services the Legislative Auditor's deemed necessary to rectify the town's accounting problems, including reconciling accounts, implementing a centralized record-keeping system, developing

22

and implementing an accounting system, and training staff on the new software. While Ms. Wade was able to accomplish many things on the Legislative Auditor's "to-do" list, her contract expired before she was able to complete the work. Additionally, in 2011, defendant hired Sharetha Houston, who had previous training in the new Quickbooks software, to enter checks into the new system and assist with bank reconciliations and payroll. Ms. Houston was fired by defendant the following year, however, over a dispute with defendant as to whether certain employees were entitled to holiday pay. Defendant also attempted to hire Mr. Folden as chief financial officer of the town, but Mr. Folden declined the offer because he "felt like ... you've got to want to do it right to do it right."

In addition to the personnel hires, defendant attended numerous audit advisory council and fiscal review committee meetings in Baton Rouge, along with members of his staff. Furthermore, there was evidence offered to suggest that some of the accounting problems encountered by the town were inherited from the previous administration. Margie Williamson, the independent certified public accountant retained by the town to perform the audits for the 2009 and 2010 fiscal years, testified that in conducting her audits, which resulted in disclaimers for both years, she discovered outstanding checks dating back to 1995.

Nevertheless, Ms. Houston testified that when concerns about the incompetence of personnel were brought to defendant's attention, he did not seem to be concerned or to want to get involved. Ms. Holland, a former town clerk, verified that defendant would not force employees to do their jobs and that, when complaints were brought to defendant, although he promised he would handle matters, he failed to take action to address the problems she raised. Jonald Walker, the independent certified public accountant hired to perform the town audits for the fiscal years ending

June 30, 2011 and June 30, 2012, testified as to policies and procedures he recommended the town adopt at the conclusion of his 2011 disclaimer audit. According to Mr. Walker, while the town followed his recommendation and adopted policies and procedures, when he returned for the 2012 audit, he discovered that many of the staff were unaware of those policies as copies had not been provided to them. He testified that the situation in 2012 was actually worse than 2011 insofar as being able to conduct a clean audit.

As defendant points out, the record does contain testimony establishing that defendant and his staff provided the auditors with open access to all *existing* documents, offices and staff, and assisted with obtaining whatever records *existed*, and no testimony demonstrates that defendant or any of his staff ever denied access or acted to prevent anyone from obtaining any *existing* documents or records. However, this argument misses the point. The duty that exists under La. R.S. 24:513 is the duty to furnish the Legislative Auditor with such records as he may request and that he has the right to inspect and examine. The offense that forms the basis of the malfeasance charge in Count I is that defined in La. R.S. 24:518–the neglect, refusal, or failure to furnish those records. In this case, the state's evidence demonstrates that the crux of defendant's offense is not the blocking of access to existing documents, but the *neglect, refusal or failure* to prepare and preserve the necessary records in the first instance (a violation of La. R.S. 44:36 and 44:412).

In brief, defendant counters that the town clerk is statutorily designated as the individual responsible for management and maintenance of municipal records, and the record is devoid of evidence that he acted as a principal to the clerk's failure to perform statutorily-imposed duties or that he intentionally permitted the clerk's poor record maintenance. While it is certainly true that the clerk is charged by statute with

24

the duty to "keep such ... books and records as may be provided for by ordinance, and ... file in his office and preserve all records and papers appertaining to the business of the municipality," (La. R.S. 33:421) as mayor, defendant was charged with the duty of supervising and directing the administration and operation of municipal departments to ensure conformity with applicable provisions of state law. See La. R.S. 33:404(A)(1). The testimony demonstrates that defendant did just that, actively inserting himself in all aspects of municipal operations. According to Mr. Folden, the independent certified public accountant who conducted all but two of the town audits between 1985 and 2007, prior to the time defendant assumed office, long-time town clerk Bea Rice controlled the town's documents and, as clerk, had instituted proper controls. After defendant assumed office, Ms. Rice "had pretty much been taken out of the loop on pretty much everything." Shortly thereafter, Ms. Rice resigned and, when Mr. Folden returned to attempt the 2008 audit, defendant "wanted his hand on everything that took place." According to Mr. Folden, defendant "pretty much wanted to have the final say on pretty much everything. I think we were given at one point an organizational chart, and you had the mayor, and then pretty much everybody was across the straight line underneath that. And–and his comments–his comments to me were that he was the CEO, the man in charge, and he made the decisions." In a similar vein, Margie Williamson testified that it was defendant who assumed responsibility for taking corrective action to rectify the accounting and record-keeping deficiencies that she reported in her June 30, 2009 disclaimer audit. As the testimony previously recounted establishes, defendant assumed personal responsibility for ticket sales for the town's Gospel Concert and failed to produce the records of those sales requested by the legislative auditors. Finally, former town clerk

25

Melba Holland testified that she resigned from her position when the job became too stressful because defendant would not force employees to do their jobs.

Of course, defendant is correct in his contention that to sustain a conviction for malfeasance in office, there must be proof that defendant *intentionally* refused or failed to perform a duty imposed on him by law, or *knowingly* permitted an employee under his authority to *intentionally* refuse or fail to perform any such duty. See La. R.S. 14:134(A)(1) and (3); **Petitto**, 10-0581 at 13, 59 So.3d at 1254. Specific intent in this context is statutorily defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). As a state of mind, specific intent need not be proved as a fact, but may be inferred from the circumstances of the transaction and the actions of defendant. **State v. Graham**, 420 So.2d 1126, 1127 (La. 1982).

In this case, the question presented is whether the evidence is such that any rational juror could reasonably infer that defendant's refusal and/or failure to perform his statutory duties as mayor was intentional.[11] Evaluating the evidence, as we must, in the light most favorable to the prosecution,[12] giving deference to the jury's assessment of credibility and weighing of the evidence, and without substituting our appreciation of the facts for that of the jury,[13] we answer that inquiry in the affirmative.

With the first disclaimer audit issued by Mr. Folden in 2008, continuing through the June 1, 2011 compliance audit completed by the Legislative Auditor,

---

[11] See **Jackson**, 443 U.S. at 319.

[12] See *id.*

[13] See **Crawford**, 14-2153 at 20, 218 S.3d at 26.

defendant had notice of the town's noncompliance with the obligations imposed by La. R.S. 24:513 and the criminal consequences that flow therefrom. See La. R.S. 24:518. Defendant also had notice that the failure of the town to provide documentation supporting the 172 expenditures requested by the legislative auditors rendered the town in violation of La. R.S. 44:36. Nevertheless, the evidence shows that the town's financial and record-keeping problems persisted, resulting in five consecutive disclaimer audits. Further, none of the required audits were submitted timely,[14] and it was defendant who, rather than ensure compliance with state law, requested extensions. In addition, there was testimony from legislative auditors Kevin Kelley and Kunta Osberry that, despite having multiple opportunities to produce the missing documentation for 172 town expenditures, it was not until just days prior to trial that defendant produced the allegedly missing documents, and the invoices produced were "suspect" and the requested documentation was still "not complete." As regards the Gospel Concert ticket sales, there was testimony that defendant assumed personal responsibility for ticket sales, promised Mr. Osberry that he would produce the records of tickets sales, and failed to do so. Further, Ms. Holland testified that she resigned her position as town clerk as a result of defendant's failure/refusal to address the management problems she raised. Finally, despite a recommendation in the compliance audit report of 2011 that a records retention schedule be developed and submitted to the state archivist, there was no evidence of any attempt by the town to submit such a schedule, and Ms. Whitehead's testimony confirmed that, as of the date of trial, the town had no formal records retention schedule on file.

---

[14] See La. R.S. 24:513(A)(5)(a)(i) requires that "audits shall be completed within six months of the close of the entity's fiscal year."

Given the foregoing, coupled with the testimony establishing that defendant took an active part in management of the town's finances and wanted his hand on everything that took place, we find that the jury was reasonable to infer from the circumstances the requisite intent on the part of defendant.

Specific intent is an ultimate legal conclusion to be resolved by the finders of fact. **Graham**, 420 So.2d at 1128. In finding defendant guilty as charged in Count I, the jury necessarily reached a conclusion that specific intent was present, along with all of the other elements of the crime of malfeasance in office. We find this conclusion was within the jury's discretion, which, as we have noted, should be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. See **Crawford**, 14-2153 at 20, 218 So.3d at 26.

As the court of appeal noted in its opinion:

> When the Town received the first disclaimer, Defendant had notice of the dire state of the Town's financial records and practices. As mayor, he knew it was his duty to resolve these problems so that the Town could become and remain compliant with state laws regarding audits and preservation of public records. However, the same problems plagued the Town for the following four years; and, as new disclaimers were reported, Defendant received additional notice that the Town's records were still not properly maintained.

**Thompson**, 49,483 at 53-54, 163 So.3d at 173-74.

The fact that the same problems with financial recordation and management persisted for five consecutive years without remedy is evidence from which any rational factfinder could reasonably infer that defendant's failure to perform his statutory duty as mayor to ensure the town's compliance with state law was intentional. The evidence presented by the state is such that a rational juror could have reasonably believed that the efforts defendant did make to rectify the situation were not sincere ones, especially when coupled with testimony that defendant failed

to follow the law in other respects, *e.g.*, by failing to provide proper documentation for his use of a town vehicle and by using town funds to pay for an inauguration ceremony.[15]

Evaluating the evidence in the light most favorable to the prosecution, giving deference to the jury's obvious assessment of credibility and weighing of the evidence, and without substituting our own appreciation of the facts for that of the jury, we find that the evidence was sufficient to find defendant guilty beyond a reasonable doubt as to Count I of the malfeasance in office charge.

### *Count II*

In Count II, the state charged that between January 2011 and June 2012, defendant committed malfeasance in office by misappropriating or taking public funds belonging to the town of Jonesboro in the amount of $13,720.75, with the intent to permanently deprive the town of the funds, without the town's consent, and by means of fraudulent conduct, practices, or representations. More precisely, the state charged that defendant, as a principal, paid public funds totaling $13,720.75 to the Municipal Employees' Retirement System ("MERS") on behalf of employees who were not eligible for MERS participation because they were not actively employed on a permanent regularly scheduled basis of at least 35 hours a week.

The specific provisions of law defendant is charged with violating in this Count are La. R.S. 14:67, 11:1751 and 11:1732(13). Louisiana R.S. 14:67(A) defines the crime of theft as follows:

> Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the

---

[15] While testimony as to these latter acts was found by the court of appeal to have been improperly admitted in evidence, **Thompson**, 49,483 at 73-74, 163 So.3d at 183-84, review of the sufficiency of the evidence takes into account all of the evidence introduced at trial, inadmissible as well as admissible. See **State v. Mack**, 13-1311, p. 12 (La. 5/7/14), 144 So.3d 983, 991.

29

misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.

Louisiana R.S. 11:1751 addresses membership in the MERS, which "shall be composed of all employees." An employee is defined in La. R.S. 11:1732(13) as "a person including an elected official, actively employed by a participating employer on a permanent, regularly scheduled basis of at least an average of thirty-five hours per week."[16]

Given these definitions, to prove this Count of the malfeasance charge, the state had to present evidence establishing that between January 2011 and June 2012, defendant made $13,720.75 in payments to MERS on behalf of employees whom he knew were ineligible to participate in MERS. To meet this threshold, the state was required to prove (1) that municipal employees were in fact ineligible to participate in MERS because they were not actively employed on a permanent regularly scheduled basis of at least an average of 35 hours a week during the charged period; (2) that defendant knew the employees were ineligible when the MERS payments were made, yet he or members of his staff made fraudulent representations to MERS that the employees were eligible; and (3) the total amount of payments defendant knowingly made on behalf of eligible employees during the period between January 2011 and June 2012 was at least $13,720.75.

*Ineligibility for MERS participation*

To prove the town employed persons who were ineligible to participate in MERS, the state relied primarily on the testimonies of William Ryder and Greg

---

[16] La. R.S. 11:1732 was amended subsequent to the date of the offense charged, and the relevant provision has been re-designated as La. R.S. 11:1732(13)(a). See 2014 La. Acts 320, § 1, effective July 1, 2014.

30

Clapinsky. Mr. Ryder is a retiree from the Legislative Auditor's office who was appointed by the court as fiscal administrator of the town of Jonesboro following a unanimous recommendation by the Fiscal Review Committee. Mr. Ryder served as fiscal administrator from July 25, 2012, until October 18, 2012, a period of roughly three months. He testified that he noticed during his first week on the job that municipal employees did not appear to work fixed schedules. Upon investigating further, Mr. Ryder identified six employees who did not appear to be working sufficient hours to be classified as full-time employees. In order to determine if his suspicions with respect to these employees was correct, he reviewed payroll records for the preceding 53 weeks and created a document summarizing the hours worked by the six employees for each of the 53 weeks, including along with regular hours, holiday hours, sick days, vacation days, and paid personal leave days. Drawing on the town's employee handbook, which defines part-time employees as "those who consistently work fewer than 35 hours per week," and further states that "[e]mployees who consistently work more than 35 hours per week are full-time," Mr. Ryder concluded that these six employees were not full-time employees consistently working more than 35 hours per week and, thus, were not eligible to participate in MERS. Mr. Ryder testified that he informed defendant of his conclusions, and defendant responded that it was defendant and the employees' supervisors who determined whether someone was full or part-time.

Mr. Ryder turned his findings with respect to the six employees over to Mr. Clapinski, an investigative audit manager with the Legislative Auditor's office who oversaw the investigative audit of March 13, 2013. Mr. Clapinski testified that he reviewed the schedule prepared by Mr. Ryder and then went back and reviewed the payroll records for these employees for an 18-month period–from January 2011

31

through June 2012. He concluded that two of the employees identified by Mr. Ryder were not participating in MERS during the relevant time period and, thus, excluded them from his calculations. He explained that he contacted MERS and matched employee earnings and contribution reports with checks that the town issued to MERS to conclude that the town used public funds totaling $13,721 to pay the employer portion of retirement contributions for ineligible employees. The checks were dual signature checks, and defendant signed each one. On cross-examination, Mr. Clapinski explained that he relied on the town employee handbook in determining whether an employee was full or part-time and, thus, entitled to benefits.

In brief, defendant points out that it is the statute, La. R.S. 11:1732(13), that determines eligibility to participate in MERS, and not the town's employee handbook. Pursuant to La. R.S. 11:1751, if a municipality elects to participate in MERS, then all eligible employees, defined as persons "actively employed ... on a permanent, regularly scheduled basis of at least an average of thirty-five hours per week," "*shall* become members of this system." La. R.S. 11:1751(A)(1); La. R.S. 11:1732(13) (emphasis added). Robert Rust, the executive director of MERS, confirmed that "all employees who are regularly scheduled to work thirty-five hours a week and are permanent employees must be members of the retirement system." He further testified that a "regularly scheduled employee" for purposes of MERS is "a full-time employee that's supposed to work thirty-five hours a week," and verified that the full-time status does not change if a permanent regularly-scheduled employee periodically works fewer than 35 hours.

Susita Suire, the administrative assistant at MERS, testified that whenever a municipality hires a new employee, a MERS enrollment form must be completed, and someone from the city must verify the employee's full-time status. She explained that

32

a town's policy regarding full or part-time status is irrelevant to MERS eligibility determinations, which are governed by statute. She acknowledged that Mr. Ryder contacted her in September or October 2012 with questions about employee eligibility for participation in MERS and, in connection with that inquiry, sent her the spreadsheet he had prepared documenting work hours for six employees over a 53-week period; however, she testified that the spreadsheet did not contain information relevant for determining MERS eligibility.

Ms. Suire explained that she also received an inquiry about MERS eligibility from David Dill, who was at that time acting as an assistant to defendant. She identified the letter she sent to Mr. Dill on August 10, 2012, in response to his inquiry, which explained MERS policy in pertinent part as follows:

> All full time permanent employees hired to work a regular schedule of at least an average of thirty-five (35) hours per week must become members of the retirement system and begin contributing on their first day of full time employment. There is no waiting period or any other kind of delay between the date of employment and enrollment in membership in the retirement system (page 5 of the handbook).

> The Town of Jonesboro shall remit employee and employer contributions on the total regular earnings paid to an active member whether or not this employee works a full 35 hours per week.

To establish the employment status of the six employees whose MERS eligibility was questioned by Mr. Ryder, defendant offered the testimony of Gwan Jefferson, Jonesboro's public works supervisor in the street department. Mr. Jefferson testified that he supervised employees Ryhemio Wyatt, Jerry Lester, and Donte Amos between September 2011 and August 2012, and all were permanent staff, regularly scheduled to work from 7:00 a.m. to 4:00 p.m. He testified that he also supervised Dwight Davis, and that Mr. Davis worked the 7:00 a.m. to 4:00 p.m. schedule during this period, but by the time of trial Mr. Davis had requested that his

33

hours be reduced. Kanesha Raybon testified that she was hired as a full-time employee of the town of Jonesboro and that her hours as human resources director were initially from 7:00 a.m. to 4:00 p.m., but had been changed to 8:00 a.m. to 5:00 p.m. by the time of trial. Calvin Moore, an investigative auditor with the Legislative Auditor's office, testified that his investigation into Mr. Ryder's allegations revealed the employees in question were scheduled to work from 7:00 a.m. until 4:00 p.m., five days a week.

Denise Akers, general counsel for MERS, testified that she received Mr. Ryder's inquiry regarding employee eligibility for MERS participation from Ms. Suire, along with the spreadsheet he had prepared. Because the numbers presented were "confusing," after conferring with a supervisor, she replied to the inquiry by providing a copy of the MERS policy, instructing the town to apply that policy and asking that MERS be notified of any breaks in service experienced by any employee. She received a similar inquiry from Douglas Stokes, the town's attorney, and replied to this inquiry in a similar fashion–reiterating MERS policy and asking the town to provide "a more detailed report ... so we can determine what, if any, credible service these employees have accrued over the time period worked with the City of Jonesboro."

Ms. Akers testified that frequently employees require leave in excess of their paid leave and, as a result, MERS policy is such that an employee does not become categorically ineligible for participation in MERS when his or her hours dip below 35 hours per week. Instead, MERS suspends eligibility for such breaks in service if, on a rolling 30-day basis, the employee's hours drop below the minimum. When the employee's hours again reach the minimum, participation in MERS is resumed. Ms. Akers further testified about a statement she made to the effect that if the town had

34

been telling MERS that employees were working 35 hours per week and they were not, the town would have a made a false certification. She explained that in making that statement, she was simply responding to a hypothet. According to Ms. Akers, MERS was not going to step in and interpret the numbers provided by Mr. Ryder because they were confusing. She reiterated that MERS eligibility is separate from the town's policy with regard to whether an employee is full or part-time.

As a review of the foregoing testimony reveals, the only evidence offered by the state to prove the hours worked by the six employees was the spreadsheet prepared by Mr. Ryder, and both Ms. Suire and Ms. Akers testified that the numbers presented were confusing[17] and did not convey the information necessary to determine whether the employees in question were eligible to participate in MERS or had breaks in service.[18] Given the testimony from the MERS representatives that the spreadsheets relied on by the state's witnesses did not contain sufficient information to determine whether the employees were eligible for MERS participation or had any breaks in service, even viewing the evidence in the light most favorable to the prosecution, no rational factfinder could conclude that the state proved any of the employees in question were ineligible to participate in MERS. See **State v. Higgins**, 03-1980, pp. 17-18 (La. 4/1/05), 898 So.2d 1219, 1232 ("The due process standard of review under **Jackson**, 443 U.S. at 319, 99 S.Ct. at 2789, does not sanction juror speculation if the evidence is such that a reasonable factfinder must have a reasonable doubt.")

---

[17] In fact, the spreadsheet does not appear to conform to the calendar in any identifiable way. The spreadsheet lists 53 weeks between the first week of September 2011 and the last week of August 2012, rather than the conventional 52 weeks. The spreadsheet only identifies pay periods by the month, year, and week, and lists five months comprised of five weeks, which cannot be reconciled with the calendar or the employee work-hours corresponding to those weeks.

[18] While Ms. Suire indicated that the number of hours worked by and employee is significant to MERS participation, that testimony related to the calculation of possible breaks in service. **(3839)**

*Knowledge of employee ineligibility for MERS participation*

To prove Count II of the bill of information, it was not only necessary for the state to establish that municipal employees were in fact ineligible to participate in MERS–a threshold the state failed to meet–but the state was also required to establish that defendant knew the employees were ineligible when the MERS payments were made–between January 2011 and June 2012–yet intentionally permitted improper payments to be made on behalf of the employees. To establish this element of the offense, the state relied on the testimony of Ms. Holland, Ms. Houston, and Mr. Ryder. Ms. Holland testified that she confronted defendant at some unspecified time during her tenure regarding two employees under her supervision who were not working regular hours. Ms. Houston testified to a letter she prepared at the end of June 2012, informing defendant of her opinion that certain employees were not eligible to receive holiday pay for Memorial Day because the employees "have not habitually or regularly worked 35 or more hours and/or did not work the full day after or before the holiday as specifically required in Town policy." Mr. Ryder, who assumed his position as fiscal administrator of the town on July 25, 2012, testified that shortly after assuming his duties, he prepared a spreadsheet of employee hours and then confronted defendant with his opinion that some employees were ineligible to participate in MERS.

The problem with this testimony is evident. It fails to establish that defendant was alerted to the possibility that municipal employees who were ineligible to participate in MERS were doing so and, thus, that defendant had knowledge that improper payments were being made during the time period charged in the bill of information. Ms. Holland's testimony simply reflected her concern with getting staff to work regular hours; Ms. Houston's complaints centered solely on employee

eligibility for benefits, *i.e.*, holiday pay, under the town employee handbook; and Mr. Ryder did not confront defendant about MERS eligibility until some time after he assumed his duties in July 2012, which is after the date charged in the bill of information.

What the evidence does demonstrate is that there was some confusion as to eligibility for MERS benefits, and the issue was originally brought to light when, on August 10, 2012, (two months after the charged period) Mr. Dill, defendant's assistant, sought an opinion on the topic from MERS. As quoted *supra*, Ms. Suire replied to Mr. Dill's inquiry by explaining that MERS participation is mandatory immediately upon hiring for employees scheduled to work 35 hours or more per week, and that employees must continue to participate, regardless of whether they actually work fewer hours during a given week. Thus, the evidence indicates that as of August 10, 2012, defendant had sought and obtained from MERS advice indicating that participation in MERS was mandatory. It was not until October 3, 2012, that Mr. Ryder sought his own opinion from MERS regarding employee eligibility for participation–a date after the period charged in the bill of information, that cannot reasonably form the basis for attributing any notice or knowledge of wrongdoing to defendant.

Consequently, even assuming the state had been able to establish that employees had a break in service or were ineligible to participate in MERS because of their failure to work the required hours, the state presented no evidence that defendant knew this when he authorized the MERS payments. The evidence shows that Mr. Ryder and Ms. Houston *retroactively* analyzed employee payroll records and, on that basis, sought a determination from MERS that the employees were ineligible. The only evidence introduced to show defendant intentionally permitted improper

37

payments to be made on behalf of employees was Mr. Ryder's testimony that defendant disagreed with him as to who was part-time and who was full-time for purposes of MERS participation when Mr. Ryder brought the matter to his attention sometime after July 25, 2012. In short, the state presented no evidence that defendant had notice of possible eligibility concerns until after the MERS payments were made. Moreover, the state presented no evidence that defendant ever misrepresented to MERS the hours worked by employees; rather the evidence revealed that the town's payments to MERS on behalf of the employees were calculated on the basis of the hours they actually worked.

Given the foregoing, we conclude that, after viewing all of the evidence as favorably to the prosecution as a rational factfinder can, no rational factfinder could conclude that the state proved all of the elements to Count II of the malfeasance charge beyond a reasonable doubt. The state failed to offer evidence either that municipal employees were ineligible to participate in MERS, or that defendant knew employees were ineligible to participate in MERS at the time MERS payments were made, yet he or members of his staff made fraudulent representations to MERS that the employees were eligible. See generally, **Jackson**, 443 U.S. at 314 ("[A] conviction based upon a record wholly devoid of any relevant evidence of a crucial element of the offense charged is constitutionally infirm.").

In reaching a contrary conclusion, the court of appeal appears to have erroneously conflated the evidence regarding employee participation in MERS (which is governed by statute) with the similar but distinct issue of employee eligibility for town benefits (which is governed by the town's employee handbook). Rather than apply the pertinent eligibility standards–those set forth in La. R.S. 11:1751 and 11:1732(13)–the court of appeal relied on the "consistently working" standard set

forth in the employee handbook to conclude the state had shown that six employees were ineligible for MERS. **Thompson**, 49,483 at 57, 163 So.3d at 175 ("The evidence presented at trial demonstrates that six employees were not consistently working 35 hours per week, but were included in the MERS system."). However, the clear wording of the statute, and the testimony of MERS representatives Mr. Rust, Ms. Suire, and Ms. Akers confirms that MERS participation is a mandatory obligation for all permanent employees *regularly scheduled* to work at least 35 hours per week, regardless of hours actually worked, and that MERS provides for breaks in service, rather than disenrollment for those not averaging 35 hours per week on a sustained basis.

Further, the court of appeal appears to have added to its error by misconstruing the evidence. The court of appeal's affirmance of defendant's conviction on Court II is based on a finding that "[s]everal witnesses testified that they notified Defendant of the improper payment of retirement contributions for ineligible employees," and that "Defendant's decision to continue using the Town's public funds to pay retirement contributions for ineligible employees, even after being notified of their ineligibility, indicates his intent to permanently deprive the Town of these public funds." **Thompson**, 49,483 at 57, 163 So.3d at 175. As discussed at length above, the state introduced no evidence to show that defendant had notice of possible MERS eligibility issues until after Mr. Ryder was appointed fiscal administrator on July 25, 2012. Moreover, the testimony reflects that once Mr. Ryder retroactively analyzed the timesheets of the questioned employees and wrote to MERS seeking a determination of eligibility, which MERS declined to provide, Mr. Ryder terminated MERS payments for the employees effective October 3, 2012. Thus, there was no evidence from which any factfinder could reasonably conclude that defendant

intentionally permitted improper payments on behalf of employees after he was notified their eligibility was in question. As a result, the court of appeal erred in affirming defendant's conviction on Count II of the malfeasance in office charge.

### *Count III*

In Count III, the state charged that between January 2011 and June 2012, defendant committed malfeasance in office by taking or using public funds belonging to the town of Jonesboro in the amount of $38,072.06, without the intent to permanently deprive the town of the funds, but without the town's consent, and by means of fraudulent conduct, practices, or representations. Specifically, the state charged that defendant used public funds to pay Blue Cross Blue Shield of Louisiana insurance premiums for individuals not employed by the town.

The provision of law defendant is charged with violating in this Count is La. R.S. 14:68, or unauthorized use of a movable, which is defined as "the intentional taking or use of a movable which belongs to another, either without the other's consent, or by means of fraudulent conduct, practices, or representations, but without any intention to deprive the other of the movable permanently." La. R.S. 14:68(A).

The state's theory under this Count was that town funds were used to pay Blue Cross insurance premiums on behalf of individuals who were no longer employed by the town, which constitutes unauthorized use of a movable. Defendant, as mayor, had a duty to direct and supervise the administration of the town in conformity with applicable provisions of state law, but by continuing to sign insurance premium checks and by willfully failing to ensure that the policies of former employees were cancelled, defendant committed malfeasance in office.

The state's evidence in furtherance of this theory consisted of testimony from two Blue Cross employees, two members of the investigative audit team who worked

40

on the March 2013 investigative audit, and two former town employees. Ms. Holland, who served as town clerk from January 2011 until August 2012, testified that one of her duties was to pay the Blue Cross bill. She explained that in the course of reviewing the Blue Cross invoice, she noticed that some former employees had erroneously remained on the monthly invoice and that, consequently, the invoice included their premiums. Ms. Houston, who was working under Ms. Holland at the time, also recognized the problem and created a spreadsheet breaking down the monthly premium charges for each employee by department, including in the breakdown the employment status of each employee. Ms. Holland testified that "at some point" she notified defendant "that we were having problems trying to get some employees off the Blue Cross invoice, and he would say, you know, 'Okay.' I'd say, 'We're trying to work on it.' And I gave him copies of where we were trying to cancel the employees."

Ms. Holland explained that she, along with employees Kanesha Raybon and Yunti Belton, repeatedly submitted cancellation forms to Blue Cross, however, "the next month the employees would still be on the invoice, so we kept going through the same process over and over again of trying to submit the cancellation form to get the employees off." Ms. Holland testified that, in addition to submitting cancellation forms, she had numerous phone conversations with Blue Cross employees regarding the matter. Ms. Holland explained that she paid the invoices every month, despite the inclusion of erroneous charges because her failure to pay in full would result in Blue Cross's cancellation of all employees' insurance policies. During the cross-examination of Ms. Holland, the defense introduced the Blue Cross Coverage Cancellation forms that Ms. Holland, Ms. Raybon, and Ms. Belton had submitted for the employees in question, along with corresponding fax verification sheets dated

41

February 16, 2011; May 10, 2011; July 27, 2011; September 30, 2011; May 24, 2012; June 4, 2012; and June 25, 2012.

Becky LeBlanc, a legal secretary for Blue Cross, confirmed that the town had repeatedly submitted cancellation forms, but explained that the forms were rejected either because the town was using old, outdated cancellation forms or because information, such as a signature and date, was missing and the forms were incomplete. Dawn Williams, an automated enrollment specialist with Blue Cross, testified about the coverage cancellation process. She explained that to cancel a particular employee of the group, a form would have to be filled out and submitted to Blue Cross within 30 days of the employee's termination for Blue Cross to end coverage at the end of the billing cycle. She noted that if the form is submitted more than 30 days from termination, Blue Cross will terminate coverage at the end of that billing cycle, but termination will not be retroactive to the actual termination date of the employee. Ms. Williams stated that it appeared that the town was diligently attempting to cancel coverage for the former employees, but she did not know why it took six months to a year to do so.

Finally, Mr. Clapinsky testified that, as part of his investigative audit, he and his team of auditors reviewed the amounts the town paid for insurance for former employees and determined that, from January 2011 to June 2012, the town paid $38,072 in insurance premiums for former employees and officials. Calvin Moore, a member of Mr. Clapinsky's audit team, testified that defendant's signature appears on the insurance premium checks and that, when he asked defendant about the invoices, defendant indicated that it was the staff's responsibility to remove the employees from coverage.

In finding the evidence sufficient to sustain defendant's conviction for Count III, the court of appeal evidently relied on Mr. Moore's assertion that defendant told him that it was staff's responsibility to cancel the insurance coverage and not his to conclude that defendant "took no action to assist the employees in ending these payments," thereby violating "his statutory duty to properly manage the employees' and the Town's resources." **Thompson**, 49,483 at 59, 163 So.3d at 176. However, it is this conclusion on part of the appellate court that exposes the flaw in the state's case.

As we have repeatedly recognized, the malfeasance statute does not punish all forms of misconduct in office; rather, as an essential element of its case, the state must prove the existence of an affirmative duty delineated by statute or law that is imposed on the defendant public official. See **Petitto**, 10-0581 at 8-9, 59 So.3d at 1251; **Davis**, 634 So.2d at 1170; **Perez**, 464 So.2d at 741. This is because, in the absence of some provision of law which specifically directs the public official's action, it is fundamentally unfair to attempt to judge, after the fact, what specific things he or she should have done.

In this case, the court of appeal found that defendant had a duty to "assist the employees" in performing their jobs, *i.e.*, in cancelling the insurance coverage, a duty which allegedly derives from a broader duty to "properly manage the employees' and the Town's resources." **Thompson**, 49,483 at 59, 163 So.3d at 176. However, the statute which sets forth the duties of a mayor, La. R.S. 33:404, delineates as one of those duties, not the specific duty to "properly manage the employees' and the Town's resources," but the duty "[t]o supervise and direct the administration and operation of all municipal departments, offices, and agencies, ...**in conformity with ordinances adopted by the board of aldermen and with applicable provisions of**

43

**state law**." La. R.S. 33:404(A)(1) (emphasis added). This statute, upon which the state relies in charging defendant, imposes a general duty on defendant to administer the town in conformity with ordinances properly adopted and with applicable provisions of state law. **Davis**, 634 So.2d at 1170. As a result, to prove its case, it was incumbent on the state to prove the existence of either an ordinance or a state law that imposed on defendant the express duty to manage the employees' and the town's resources by assisting staff in cancelling insurance coverage for former employees. The state failed to prove the existence of any such ordinance or state law and, consequently, failed to prove an affirmative duty imposed by law on the defendant, an essential element of the malfeasance charge.[19] See,e.g., **Davis**, 634 So.2d at 1172 (wherein the court reversed and vacated defendant's malfeasance in office conviction because the state failed to prove the existence of a valid town ordinance establishing the duty of the mayor regarding payment of annual and sick leave).

Further, to the extent that the bill of information charges defendant as a principal to unauthorized use of a movable (a violation of state law), the state's evidence likewise falls short. Although the state's evidence did show that the town did not promptly cancel health insurance for some former employees, there was absolutely no evidence whatsoever to indicate that defendant or any member of his staff engaged in any "fraudulent conduct, practices, or representations" in failing to timely cancel insurance coverage or in continuing to pay premiums while cancellations were pending, as required by La. R.S. 14:68(A). Evidence including fax records, testimony from Ms. Holland and Ms. Houston, and testimony from Blue

---

[19] The circumstances surrounding Count III are readily distinguishable from those presented in Count I, where the provisions of La. R.S. 24:513 and 24:518 impose an affirmative, positive duty on the defendant, as a public officer of the town of Jonesboro, to furnish or provide whatever records are necessary for an audit.

Cross representatives Dawn Williams and Becky LeBlanc demonstrated that three town staff members attempted to cancel the policies at issue, but their attempts failed because they submitted outdated cancellation forms and then incorrectly completed the updated forms. The state introduced no evidence to indicate that defendant's staff intentionally used incorrect forms, intentionally filled out the forms incorrectly, submitted any fraudulent information, or that defendant directed anyone to do so. Although repeated submission of outdated or incomplete forms by several different staff members could demonstrate incompetence and/or negligence, and although wholly unacceptable from the standpoint of managing the town's finances, the state's evidence is insufficient to show that defendant or his employees intentionally refused to perform a duty lawfully required of them, intentionally performed any duty in an unlawful manner, or deprived the town of funds through fraudulent conduct, practices or representations. Therefore, viewing the evidence in the light most favorable to the state, we find that no reasonable factfinder could have found that the state's evidence was sufficient to prove beyond a reasonable doubt that defendant was guilty of malfeasance in office as to Count III. The court of appeal erred in finding to the contrary.

### *Mistrial*

Having concluded the evidence is sufficient to support defendant's conviction of Count I of the malfeasance charge and that defendant is not entitled to an acquittal in relation to this charge, we must now consider defendant's remaining assignments of error to determine whether defendant is nevertheless entitled to a new trial. See **State v. Hearold**, 603 So.2d 731, 734 (La. 1992). In doing so, we turn first to defendant's contention that the district court erred in denying his motion for mistrial

and the court of appeal erred in applying a harmless error analysis to gauge the effect of that erroneous ruling.

Early in the course of trial, the defense made an oral motion for mistrial during the testimony of Legislative Auditor Purpera, when the prosecutor stated: "Mr. Purpera, there's been an allegation made ... [that] the Mayor has been harried by various conservative and or white people ...." The defense objected to this statement and moved for a mistrial on grounds that the prosecutor was injecting race into the proceedings. The prosecutor responded by arguing that although the defense had not expressly used the term "white people," it was implied by the defense's opening argument that he won the race for mayor just ahead of his opponent, yet his opponent and detractors would not accept defeat and kept moving the finish line so that defendant could never succeed as mayor.[20]

Agreeing with the prosecutor, the district court denied the motion for mistrial, finding that defense counsel's opening statement did use examples that indicated race was an issue, but stating that the district court would admonish the jury regarding the "white people" comment. Defense counsel responded to the adverse ruling, insisting that he had made no references or allusions to race during opening argument, but rather identified particular detractors of defendant, including the former mayor and disgruntled former employees, not all of whom are white. Defense counsel acknowledged referring to race during *voir dire,* but only after the state had already done so, and only in the context of exploring whether potential jurors could be fair.

---

[20] Notably, the defense's opening statement was preceded by that of the state, in which the prosecutor *introduced* the topic, arguing: "With respect to this non-compliance that we talked about, ... Leslie Thompson's response has always been that he's being unfairly targeted because of his race." Defense counsel responded to this argument by denying that he had made race an issue, arguing instead that the prosecution was a political one, that defendant had crossed the finish line first, winning the mayoral election, and that his detractors kept moving that finish line, deliberately undermining his effectiveness.

Nevertheless, the prosecutor continued to argue, without citing to specific examples, that the defense had repeatedly alluded to race, which entitled the state to rebut the racial implications. The district court again denied the motion for mistrial.

Defendant subsequently filed a written motion for mistrial in which he argued that "the effort to keep race from being a factor in this trial has failed." As an example, he pointed to the state's use of photos of Osama Bin Laden and President Barack Obama during *voir dire* and interchanging their names, to which use his counsel had objected.[21] He noted that the prosecutor had questioned potential jurors about the Trayvon Martin case, a case which had divided citizens along racial lines. Acknowledging that both parties had questioned potential jurors regarding the topic of racial fairness, he asserted that several members of the venire had expressed concern that their verdicts would divide the community further, and further alleged that the state had subpoenaed supporters of defendant, even though there was no reasonable expectation of calling them as witnesses, in order to keep them out of the courtroom. Finally, defendant reiterated that the prosecutor had, in front of the jury, accused defendant of talking about "white people," and argued that this appeal to race was a mandatory, and not permissive, ground for a mistrial.

The state responded to the written motion by arguing that the case had been racially charged from its inception, pointing to out-of-court incidents, such as a protest march and "videos" of defendant discussing the racial implications of his prosecution, as evidence that defendant had raised the racial issue first. The state asserted that it had the right, and obligation, to rebut defendant's race-based defense.

---

[21] In brief, the state maintains that this is an incorrect characterization of the state's pictorial display which, according to the state, consisted of a picture of Osama Bin Laden with the caption "[e]xperts agree Al-Qaeda leader is dead or alive" followed by a picture of Taliban men with the caption "where's Obama?" The state's pictorial display during the voir dire, ostensibly to demonstrate media errors, can only be described as poorly conceived and executed.

After entertaining argument, the district court denied defendant's motion for mistrial. In doing so, the court cited defendant's out-of-court activities, as well as remarks made during *voir dire* and opening statements, as justification for the state's references to race in court.

In addressing defendant's mistrial motion on direct review, the court of appeal concluded that the district court erred by failing to grant defendant's motion for mistrial. **Thompson**, 48,483 at 80, 163 So.3d at 186-87. The appellate court found that the district court's ruling was based on "an incorrect restatement of the defense's *voir dire* questioning and opening statements," and that the prosecutor's reference to "white people" while questioning Mr. Purpera was a direct reference to race that was "neither material nor relevant to the charges and, arguably, could create prejudice in the mind of the jury." *Id.*, 48,483 at 80-81, 163 So.3d at 186-87. We agree with the court of appeal's analysis and ruling in this regard.

Louisiana C.Cr.P. art. 770 provides, in pertinent part:

> Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:

> (1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;

> . . . .

> An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.

In addition, La. C.Cr.P. art. 775 sets forth the permissive and mandatory grounds for a mistrial, and states, in part:

48

> Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.

Clearly, under Louisiana law, a mistrial is mandatory when a prosecutor refers directly or indirectly to race or color and the remark or comment is not material and not relevant and might create prejudice against the defendant in the mind of the jury. **State v. Wilson**, 404 So.2d 968, 970 (La. 1981). This rule has been a part of Louisiana jurisprudence for decades. As the court explained in **State v. Kaufman**, 278 So.2d 86, 98 (La. 1983):

> The purpose of this mandatory prohibition of our 1966 code is to avoid the use of racial prejudice to obtain convictions. This is in accord with our jurisprudence since our earliest days as an American jurisdiction. It is, of course, founded upon a stringent requirement that trials be conducted in accordance with law and that convictions be founded on evidence of guilt and not upon prejudice. Without this mandatory rule of law, the convictions of innocent defendants may be secured, not because of their guilt, but because of their race.

In this case, as accurately noted by the court of appeal, both parties questioned potential jurors about race during *voir dire*, but neither appeared to say anything directly connecting race to the facts of this case. That changed after the jury was sworn and trial commenced. In his opening statement and during the examination of Mr. Purpera, the prosecutor made statements directly referencing race in connection with this case. As the court of appeal noted:

> [There is] a distinction between exploring the biases and prejudices of potential jurors during voir dire and improperly injecting race as an issue at trial. The prosecutor's reference to "white people" while questioning Mr. Purpera was a direct reference to race and was not an accurate restatement of what the defense attorney said in his opening statement or voir dire questioning. The defense attorney did not allege that "white people" or "conservatives" made allegations against Defendant that led to investigations; the defense attorney merely noted that Defendant had detractors who were unhappy that he was elected mayor. Although the trial court overruled the objection and the motion for mistrial because the defense raised the issue of race during voir dire and during opening

49

statements, this ruling was a misconstruction of the defense's comments during opening statements.

**Thompson**, 49,483 at 79-80, 163 So.3d at 186.

While the state acknowledges in brief that "you could possibly argue that the state mentioned race twice" in opening statements, it argues that the racial reference is less offensive than that in other cases in which mistrials have been declared, and the appeal to racial prejudice is less egregious. However, this court noted long ago that "race is such a sensitive matter that a single appeal to racial prejudice furnishes grounds for a mistrial, and ... a mere admonition to the jury to disregard the remark is insufficient." **Wilson**, 404 So.2d at 970. That principle holds true today.

The prosecutor's comment about "white people" in this case could only be perceived as appealing to racial prejudice, as it had no relevance to the crime of malfeasance and did not tend to enlighten the jury as to a relevant fact. We agree, therefore, with the court of appeal's conclusion that the district court erred in failing to grant defendant's motion for mistrial. However, to the extent that the court of appeal's language suggests that a mistrial was not mandatory in this case, we respectfully disagree. **Thompson**, 49,483 at 80, 163 So.3d at 187 ("[T]he trial court *could* have granted a mistrial based on the improper remark regarding race made the prosecutor.") (Emphasis added.) Louisiana C.Cr.P. arts. 770 and 775 provide that a mistrial is mandatory upon the motion of the defendant, and not discretionary as the court of appeal's language implies.

Having determined the district court erred in failing to grant defendant's motion for a mistrial, we must now determine the appropriate remedy for that error. Defendant argues the prosecutor's improper appeals to race affected substantial rights of the accused; that, as a result, prejudice is presumed; and thus the court of appeal

50

erred in applying a harmless error analysis to assess the effect of the district court's erroneous ruling. The state argues to the contrary, adopting the court of appeal's position that "precedence" dictates a harmless error analysis.

After determining the district court erred in denying defendant's motion for mistrial, the court of appeal remarked that it was "reluctantly ... constrained by precedence to find that the failure to grant a mistrial was harmless error." **Thompson**, 49,483 at 80, 163 So.3d at 187. The "precedence" the court of appeal cites for this proposition is this court's opinion in **State v. Johnson**, 94-1379 (La. 11/27/95), 664 So.2d 94.[22] However, review of that decision reveals that it addressed a single issue: "whether a harmless error analysis may be used to review a conviction where inadmissible other crimes evidence is disclosed to the jury." *Id.*, 94-1379 at 12, 664 So.2d at 100. In answering that question in the affirmative, this court clearly limited its ruling to inadmissible other crimes evidence. *Id.*, 94-1379 at 17, 664 So.2d at 102 ("[W]e hold that the introduction of inadmissible other crimes evidence results in a trial error subject to harmless error analysis."). While in the course of reaching its decision, the court discussed the mandatory provisions of La. C.Cr.P. art. 770(2), and overruled previous jurisprudence holding that a violation of La. C.Cr.P. art. 770(2) is *per se* prejudicial and a substantial denial of the defendant's statutory rights, the **Johnson** case should not be read so expansively as to encompass the issue presented in the present case: the appropriate remedy for an improper appeal to racial prejudice.[23] Besides the fact that this court carefully limited its holding in **Johnson**

_____

[22] **Thompson**, 49,483 at 69-70,79, 163 So.3d at 181-82,186.

[23] The decision in **Johnson** is procedurally, as well as substantively, distinguishable from this case. In ruling that the mandatory language of La. C.Cr.P. art. 921 provides the proper scope of appellate review, the court in **Johnson** found the mandatory language of La. C.Cr.P. art. 770(2) inapplicable to its decision because the defendant in that case had not moved for a mistrial. **Johnson**, 94-1379 at 16, 664 So.2d at 101 ("Although Article 770 is couched in mandatory terms, ... [i]ts operation depends upon motion by the defendant."). Here, defendant moved for a mistrial, both orally and in

to inadmissible other crimes evidence, there are compelling reasons for treating the issues differently. Foremost among those reasons is the fact that the erroneous admission of other crimes evidence does not implicate the equal protection considerations inherent in an appeal to racial prejudice. See **Miller v. State of North Carolina**, 583 F.2d 701, 707 (4th Cir. 1978) (citing **United States ex rel. Haynes v. McKendrick**, 481 F.2d 152, 158-59 (2nd Cir. 1973) ("One of the animating purposes of the equal protection clause of the fourteenth amendment, and a continuing principle of its jurisprudence, is the eradication of racial considerations from criminal proceedings."). Moreover, an appeal to racial prejudice impugns not only the concept of equal protection of the laws, but strikes at the due process guarantee of a fair trial as well. See **Miller**, 583 F.2d at 706 ("Nothing is more fundamental to the provision of a fair trial than the right to an impartial jury. The impartiality of the jury must exist as the outset of the trial and it must be preserved throughout the entire trial.") (Citation omitted.).

Because the holding in **Johnson** addresses only inadmissible other crimes evidence, that case does not serve as "precedence" for the issue presented here. Rather, the "precedence" that exists is the unbroken line of jurisprudence holding that an improper appeal to racial prejudice in violation of La. C.Cr.P. art. 770(1) is *per se* prejudicial and a mistrial is mandatory. See **Wilson**, *supra*; **State v. Jones**, 283 So.2d 476 (La. 1973); **Kaufman**, *supra*.

The provisions of La. C.Cr.P. art. 921 do not require a different result. As the court recognized in **Johnson**, La. C.Cr.P. art. 921 is a codification of the harmless error rule. It provides:

writing.

52

A judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the accused.

Also as noted in **Johnson**, this court has adopted the federal test for harmless error announced in **Chapman v. California**, 386 U.S. 18 (1967), as refined by **Sullivan v. Louisiana**, 508 U.S. 275 (1993), as a practical guide for determining whether substantial rights of the accused have been violated. **Johnson**, 94-1379 at 13-14, 664 So.2d at 100. Under that test, the inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Id.* (quoting **Sullivan**, 508 U.S. at 279).

**Chapman** recognizes that there are exceptions to the harmless error rule. **Chapman**, 386 U.S. at 23 ("[T]here are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error.") These exceptions have become known as structural errors. **Weaver v. Massachusetts**, 137 S.Ct. 1899, 1907 (2017). "The purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial." *Id.* "[T]he defining feature of a structural error is that it 'affect[s] the framework with which the trial proceeds,' rather than being 'simply an error in the trial process itself,'" and thus infects the entire proceeding, thereby "def[ying] analysis by harmless error standards." *Id.*, 137 S.Ct. 1907-08 (quoting **Arizona v. Fulminante**, 499 U.S. 279, 309-10 (1991)).

As **Weaver** explains, there appear to be three rationales that explain why a particular error is structural and not amenable to harmless error analysis: (1) "the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest"; (2) "the effects of the error are simply too hard to

measure"; and (3) "the error always results in fundamental unfairness." *Id.*, 137 S.Ct. at 1908. "These categories are not rigid"; rather in a given case, "more than one of these rationales may [explain] why an error is deemed to be structural." *Id.*

In the instant case, we are presented with an improper appeal to racial prejudice. As noted, *supra*, such an appeal may be violative of both the due process and equal protection guarantees of the federal and state constitutions.[24] **United States ex rel. Haynes**, 481 F.2d at 159 (When racial prejudices are improperly injected into a criminal proceeding, "the due process and equal protection clauses overlap or at least meet."). Indeed, it has been remarked that:

> Race is an impermissible basis for any adverse governmental action in the absence of compelling justification ... To raise the issue of race is to draw the jury's attention to a characteristic that the Constitution generally commands us to ignore. Even a reference that is not derogatory may carry impermissible connotations, or may trigger prejudiced responses in the listeners that the speaker might neither have predicted nor intended.

**McFarland v. Smith**, 611 F.2d 414, 416-17 (2nd Cir. 1979).

While the Supreme Court has not expressly ruled that an appeal to racial prejudice during the presentation of evidence or argument to the jury constitutes structural error, in our view, such an appeal carries the indicia of structural error in that racial bias implicates the defendant's right to trial before an impartial jury. Like racial discrimination in the selection of grand jurors (a structural error pursuant to **Vasquez v. Hillery**, 474 U.S. 254, 263-64 (1986)), the injection of racial considerations during the presentation of evidence harms not only the defendant, but

---

[24] U.S. Const. amend. XIV, § 1 ("No state shall ... deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."); La. Const. art. I, § 2 ("No person shall be deprived of life, liberty, or property, except by due process of law."); La. Const. art. I, § 3 ("No person shall be denied the equal protection of the laws. No law shall discriminate against a person because of race or religious ideas, beliefs, or affiliations.").

"undermine[s] public confidence in the fairness of our system of justice." **Alex v. Rayne Concrete Service**, 05-1457, 05-2344, 05-2520, pp. 23-24 (La. 1/26/07), 951 So.2d 138, 155-56 (citing **Batson v. Kentucky**, 476 U.S. 79, 87 (1986), and **Edmonson v. Leesville Concrete Co., Inc.**, 500 U.S. 614, 629 (1991)). Such considerations are among those that prompted this court, in **Alex**, *supra*, to reject a harmless error analysis in connection with a challenge to the discriminatory exercise of peremptory challenges pursuant to **Batson/Edmonson**. See **Alex**, 05-1457 at 22-24, 951 So.2d at 155-56. They are among the considerations that prompt us to conclude that an improper appeal to racial prejudice during the presentation of evidence is not susceptible to harmless error review. The right to a fair trial that is free from improper racial implications is one that serves not only to protect the defendant from a conviction founded on prejudice, but also to protect the public's confidence in the integrity of the judicial process and the administration of justice. Where the jury is improperly exposed to an appeal to racial prejudice, the impartiality of the jury as a factfinder is compromised. "Because that contamination may affect the jury's evaluation of all of the evidence before it, speculation about the effect of that error on the verdict is fruitless." **Miller**, 583 F.2d at 708. When an improper appeal to racial prejudice infects a proceeding, such as this one, a substantial right of the defendant is violated, prejudice is presumed, and reversal is required.

The court of appeal erred in applying a harmless error analysis to assess the effect of the district court's erroneous ruling denying defendant's motion for mistrial brought pursuant to La. C.Cr.P. art. 770(1).[25] Defendant's conviction on Count I of

---

[25] Even were we to hold that the improper denial of defendant's motion for mistrial is subject to harmless error review, it would be difficult to conclude beyond a reasonable doubt that the improper appeal to prejudice did not contribute to defendant's convictions. Contrary to the court of appeal's conclusion that "the state presented overwhelming evidence against Defendant upon which the jury could base its verdict[]," the evidence was clearly insufficient to support defendant's conviction of

the malfeasance in office charge must be set aside and defendant must be afforded a new trial as to this Count.[26]

## DECREE

For the foregoing reasons, we reverse the judgment of court of appeal, vacate defendant's convictions and sentences, and remand this matter to the district court for a new trial as to Count I of the malfeasance charge.

**REVERSED, VACATED, AND REMANDED**

---

Counts II and III of the malfeasance charge. **Thompson**, 49,483 at 80-81, 163 So.3d at 187. Given the particular facts and circumstances of this case, we cannot conclude with certainty that the jury's guilty verdicts were surely unattributable to the error of the district court in denying defendant's motion for mistrial once an improper appeal to racial prejudice was made.

[26] As noted, *supra*, one of the arguments that prompted our writ grant was defendant's contention that the district court erred by permitting the state to introduce unduly prejudicial "other bad acts" evidence under La. C.E. art. 404(B), and the court of appeal compounded that error by applying a faulty harmless error analysis in assessing the effect of the erroneous admissions. In its review, the appellate court found that the district court erred by issuing a global ruling admitting the "other bad acts" evidence, instead of individually assessing the admissibility of each item with findings that the individual acts were supported by clear and convincing evidence. **Thompson**, 49,483 at 71, 163 So.3d at 182. Addressing each act individually, the court of appeal found that out of the 11 "other bad acts" introduced, five were inadmissible because they were too dissimilar to be probative of any facts at issue, and/or were not supported by clear and convincing evidence. Nonetheless the court found the error in admitting the evidence was harmless. *Id.*, 49,483 at 75, 163 So.3d at 184. However, defendant argues, the appellate court's conclusion that the erroneous admissions were harmless is directly contradicted by that court's own reliance on that very evidence to find that defendant possessed the requisite intent to support his conviction for Count I. *Id.*, 49,483 at 54, 163 So.3d at 174 ("Defendant's penchant to refuse to follow the law is further illustrated by his failure to provide proper documentation for his use of the Town vehicle, for sponsoring Town events, for personally accepting payment for tickets to the event and for untimely reimbursing the Town for travel advances."). Because the court of appeal's sufficiency finding expressly relied on erroneously admitted Article 404(B) evidence to find defendant's intent had been proved, it is difficult to conclude that the verdict is surely unattributable to the error, or that the error was harmless. However, having determined that the conviction should be reversed on the mistrial issue, it is unnecessary to definitively rule on this, or any of the other errors assigned by defendant.

**SUPREME COURT OF LOUISIANA**

**No. 2015-K-0886**

**STATE OF LOUISIANA**

**VERSUS**

**LESLIE C. THOMPSON**

*On Writ of Certiorari to the Court of Appeal, Second Circuit,*
*Parish of Jackson*

**JOHNSON, C.J.,** concurs in part, dissents in part, and assigns reasons.

Although I agree with the majority that no rational trier of fact could have found defendant guilty beyond a reasonable doubt as to Counts II and III, I must dissent in this case because I also find the evidence was clearly insufficient to find defendant guilty beyond a reasonable doubt as to Count I of the malfeasance in office charge. Further, because the evidence was insufficient, defendant is entitled to acquittal on all counts and any retrial of defendant as to Count I is barred by Double Jeopardy principles.

The charges in this case arise from political strife in the town of Jonesboro, and the case has been fraught with racial undertones from inception. The defendant took office in 2000 as the first African-American mayor of Jonesboro, during a time when the town was experiencing substantial racial tensions. Throughout his two terms as mayor, the defendant was subject to opposition and obstruction from several members of the town's board of aldermen and members of his own staff. The investigations leading to his prosecution were prompted by repeated complaints from defendant's political opponents. The problems with this case continued with the trial of this matter, which was replete with errors. Although the majority chose to address only

1

one error in finding defendant was entitled to a mistrial, a review of the record reveals a multitude of other irregularities and errors.

The record reveals a clear intent by the prosecutor to stir up racial tensions with the goal to obtain an all white jury. In addition to the prosecutor's racial comments addressed by the majority, the prosecutor used a PowerPoint slide show during voir dire to display several irrelevant and racially contentious pictures to potential jurors. First, the prosecutor displayed a picture of Osama bin Laden with the caption "Hunt for Osama bin Laden." Defense counsel objected and argued that it was prejudicial because Osama bin Laden "is considered as one of the most hated people in the United States after 911 especially." The prosecutor responded that "I'm going to ask and see if they (prospective jurors) see anything wrong with the screen and the next slides are intended to display how the news often makes mistakes and gets things wrong." The district court directed the prosecutor to ask his particular question but move on to a different slide. The prosecutor then displayed a slide which he described as "a bunch of Muslims, probably Taliban folks and it says, "Where's Obama?"" The prosecutor also asked potential jurors if they thought race was a factor in the George Zimmerman case in Florida, where he was tried for shooting Trayvon Martin, a black teenager. The prosecutor's actions were a blatant attempt to inflame racial prejudices in the jurors.

The voir dire process was also troubling, and the lower courts failed to give credence to Mayor Thompson's *Batson* challenge. As pointed out by Mayor Thompson, all African-American potential jurors were eliminated from the jury pool by challenges for cause by the state, and one peremptory challenge exercised by the state. Mayor Thompson contended it was nearly impossible for him, as an African-American, to be represented by a jury of his peers because the

African-Americans in the community knew Defendant and, therefore, would be challenged for cause by the state. In the end, Mayor Thompson was tried by an all white jury.[1]

At the end of the voir dire process, Mayor Thompson filed a motion to change venue asserting media attention and pretrial publicity prevented him from receiving a fair trial in Jackson Parish. Mayor Thompson pointed out every single juror in the first panel indicated they had heard something about the case, and he referenced the extensive media coverage over the past five years. Given this pretrial publicity and the history of racial intolerance in Jackson Parish, the district court should have granted the change of venue.

The district court also erred in allowing the state to introduce "other bad acts" evidence under Article 404(B), which was clearly prejudicial. While the court of appeal correctly determined the district court erred by allowing the state to globally introduce this evidence, the court of appeal wrongly determined this was harmless error. This error was compounded because the court of appeal actually relied on this same evidence to support Mayor Thompson's conviction on Count I.

My review of the record reveals Mayor Thompson was targeted and convicted with no legal basis to do so. He is entitled to an acquittal on all three counts, including Count I. The malfeasance in office statutes are intended to protect the public by deterring public officers and employees from abusing their positions of public trust. *State v. McGuffie*, 42,069 (La. App. 2 Cir. 8/1/07), 962 So. 2d 1111, 1118, *writ denied*, 07-2033 (La. 2/22/08), 976 So. 2d 1283. Count I essentially charged that defendant committed malfeasance by failing and/or refusing to maintain proper

---

[1] The court of appeal noted that the record does not include information on the races of the potential and seated jurors in this case. However, the court further stated that "the comments made by the parties and the trial court during the *Batson* colloquy are consistent and suggest that Defendant's allegations regarding the race of the juror the state struck and racial composition of the jury are true." *State v. Thompson*, 49,483 (La. App. 2 Cir. 3/18/15), 163 So. 3d 139, 191.

records and to supply them to the Louisiana Legislative Auditor in violation of La. R.S. 24:513, La. R.S. 24:518, La. R.S. 44:36, and La. R.S. 44:412. In determining whether the evidence was sufficient to convict defendant as to Count I, the court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In reviewing the sufficiency of the evidence, "the actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law." *State v. Crawford*, 14-2153 (La. 11/16/16), 218 So. 3d 13, 26 (quoting *State v. Mussall*, 523 So. 2d 1305, 1310 (La. 1988)). The evidence presented by the state does not meet the *Jackson* standard. Jurisprudence demonstrates this court has a history of requiring more than the circumstantial evidence presented here to uphold a conviction for malfeasance. *See State v. Schwehm*, 729 So. 2d 548 (La. 1999); *State v. Davis*, 634 So. 2d 1168 (La. 1994); *State v. Harris*, 46, 721 (La. App. 2 Cir. 12/9/11), 79 So. 3d 1248.

As acknowledged by the majority, defendant correctly contended that to sustain a conviction for malfeasance in office, there must be proof that defendant ***intentionally*** refused or failed to perform a duty imposed on him by law. This court has previously explained:

> The object of the malfeasance statute is to punish a breach of duty committed with the required culpable state of mind. To this end, the statute expressly limits its application to instances in which a public officer or employee intentionally refuses or fails to perform or intentionally performs in an unlawful manner, any affirmative duty imposed by law upon him in his role as a public servant. The inclusion in the statute of a criminally culpable state of mind makes it clear that it applies only where the statutorily required mens rea is proven beyond a reasonable doubt. **Thus, mere inadvertence or negligence, or even criminal negligence, will not support a violation of the malfeasance statute because the statute specifies the act or failure to act must be intentional.**

4

*State v. Petitto*, 10-0581 (La. 3/15/11), 59 So. 3d 1245, 1254 (emphasis added). In my view, the evidence was insufficient to support defendant's conviction for malfeasance in office in Count I. The state failed to show that defendant acted with the necessary criminal intent, or that he intentionally refused to perform any duties.

My review of the nearly 2000 pages of the trial transcript reveals the state's witnesses gave generalized, seemingly biased, and sometimes irrelevant testimony. Certain witnesses testified with overt hostility and open contempt for defendant. Several former employees testified that they resigned because of stress from these conflicts, and more than one auditor testified that employee turnover was so high that it impaired their ability to conduct the audit. The charges in Count I appear, in my view, to stem from the aggregation of several years' worth of the town's management and financial issues, which the state attributed to defendant solely by virtue of his role as mayor. Both the court of appeal and the majority largely infer defendant's criminal intent from evidence of the town's shoddy recordkeeping.

The evidence demonstrates that defendant did not create the town's accounting issues, but rather inherited longstanding recordkeeping problems and a poorly-managed accounting structure. Further, no direct evidence was introduced to show that defendant acted with criminal intent, intentionally refused or failed to perform his duties, or intentionally performed his duties in an unlawful manner. To the contrary, extensive testimony showed that defendant and his staff made ongoing, albeit unsuccessful, efforts to improve the town's admittedly poorly-managed recordkeeping and accounting practices, and to properly manage the finances.

While the state presented evidence that financial records were in disarray, the evidence does not support a finding of intentional refusal or failure to perform a duty on the part of defendant. Rather, the evidence showed defendant and his staff

cooperated with auditors, attempted to provide all requested documents, and tried, although with limited success, to resolve numerous issues, all while struggling with personnel turnover and political controversy. In an effort to resolve the issues, defendant updated software, hired staff, procured staff training, and provided legislative auditors access to records. Even viewing the evidence in the light most favorable to the prosecution, I cannot conclude that defendant acted with the criminal intent necessary to support this conviction. While the evidence may well suggest a level of negligence on the part of defendant in resolving the town's financial and recordkeeping issues, negligence–even criminal negligence–is insufficient to support a conviction for malfeasance.

I also find it important to note that while motive is not an element of malfeasance, its absence in this case further undermines any finding of intent. The state failed to show that defendant had any illicit motivation sufficient to support a finding of criminal intent within his non-criminal acts, or that he derived any benefit from his actions, and the state's case fails to otherwise explain why defendant would have spent years intentionally undermining the town he was twice elected to serve.

In my view, the state had every opportunity to offer proof of its case at trial. However, the proof offered by the state was undoubtedly insufficient to support a conviction of malfeasance as to Count I. The majority effectively gives the state a second bite at the apple. Because there is a lack of sufficient evidence to support the defendant's conviction, I find he is entitled to an acquittal, rather than a mistrial. Moreover, a retrial of defendant in this case would violate the Double Jeopardy Clause. The United States Supreme Court has made clear that the Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient to support the guilty verdict. *See Hudson v. Louisiana*, 450 U.S.

6

40, 44-45 (1981). I would find *Hudson* precludes a new trial in this case, where the state has failed as a matter of law to prove its case despite a fair opportunity to do so. *Id*. at 45.

**SUPREME COURT OF LOUISIANA**

**NO. 2015-K-0886**

**STATE OF LOUISIANA**

**VERSUS**

**LESLIE C. THOMPSON**

*On writ of Certiorari to the Court of Appeal, Second Circuit,*
*Parish of Jackson*

**GUIDRY, J.**, concurs in the result.

# SUPREME COURT OF LOUISIANA

## NO. 2015-K-0886

## STATE OF LOUISIANA

## VERSUS

## LESLIE C. THOMPSON

### On writ of Certiorari to the Court of Appeal, Second Circuit, Parish of Jackson

**CLARK, J**., concurs in part, dissents in part and assigns reasons.

I concur in the opinion insofar as it concludes the evidence was sufficient to find defendant guilty beyond a reasonable doubt as to Count I of the malfeasance in office charge. However, I dissent from the remainder of the opinion.

In this case, six rational jurors found the essential elements of each of the three charged offenses beyond a reasonable doubt. Adhering to the standard of appellate review for sufficiency of the evidence set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979), I agree with the five judges of the court of appeal who determined the evidence was sufficient to convict defendant of all three counts of the malfeasance in office charge.[1] Furthermore, I disagree with vacating defendant's convictions and sentences because the district court failed to declare a mandatory mistrial after the prosecutor made a reference to "white people" during the testimony of Legislative Auditor Purpera. In my opinion, the prosecutor's comment was neither an appeal to racial prejudice nor so prejudicial that it affected the substantial rights of the accused. Because I dissent from the opinion granting defendant a new trial on Count I, I would address the pretermitted assignments of error.

Finally, for the record, I agree with the court of appeal's conclusion that defendant's sentences, while individually within the statutory guidelines, were

---

[1] A court of appeal panel comprised of three judges reviewed the record in defendant's appeal. Two judges were added to the original panel to consider defendant's application for rehearing, which was denied on April 9, 2015. See *State v. Thompson*, 49,483 (La. App. 2 Cir. 3/18/15), 163 So. 3d 139.

1

excessive when aggregated, and the district court failed to articulate sufficient reasons to run the sentences for Counts I and II consecutively, as they were based on the same acts and transactions. Thus, I believe the court of appeal correctly vacated the sentences and remanded the matter for resentencing.

## SUPREME COURT OF LOUISIANA

## NO. 2015-K-0886

## STATE OF LOUISIANA

## VERSUS

## LESLIE C. THOMPSON

## ON WRIT OF CERTIORARI TO THE COURT OF APPEAL, SECOND CIRCUIT, PARISH OF JACKSON

**CRICHTON, J., concurs in part, dissents in part and assigns reasons:**

I respectfully dissent in part from the Court's plurality opinion.[1] "Mistrial is a drastic remedy, and the determination of whether prejudice to the defendant has resulted from the prosecutor's comments lies in the sound discretion of the trial judge." *State v. Draughn*, 2005-1825, p. 44 (La. 1/17/07), 950 So.2d 583, 614. In my view, the statement made by the prosecutor—merely a preface to a question—was not an error, much less one that should be elevated to a structural error analysis. Even so, because I do not find the district court's denial of the motion for mistrial was an abuse of that discretion, I dissent in part and would address the pretermitted assignments of errors. In all other respects, I agree with the plurality opinion.

---

[1] A plurality opinion (consisting of less than four votes at the Louisiana Supreme Court) "lack[s] precedential authority." *See Warren v. La. Med. Mutual Ins. Co.*, 2007–0492 (La.12/2/08), 21 So.3d 186, 210 (Knoll, J., concurring). For the United States Supreme Court, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (internal quotations omitted).

# SUPREME COURT OF LOUISIANA

# NO. 2015-K-0886

# STATE OF LOUISIANA

# VERSUS

# LESLIE C. THOMPSON

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL, SECOND CIRCUIT, PARISH OF JACKSON

**GENOVESE, J., concurs in the result.**